Connell Foley LLP
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500
Attorneys for Defendant, Kaseya US Sales, LLC

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IT NETWORK SOLUTIONS, LLC, | CIVIL ACTION NO. _____ |
| Plaintiff, | (HONORABLE _____) |
| v. | |
| KASEYA US SALES, LLC, JOHN DOES 1-5(fictitious), ABC CORPS. 1-5 (fictitious), | **DECLARATION OF STEVEN A. KROLL, ESQ.** |
| Defendants. | |

I, **STEVEN A. KROLL, ESQ.**, of full age, hereby certify as follows:

1.      I am an attorney at law of the State of New Jersey, admitted to practice law before the United States District Court for the District of New Jersey, and am associated with the law firm of Connell Foley LLP, attorneys for Defendant, Kaseya US Sales, LLC ("Kaseya").  As such, I am fully familiar with the facts as set forth herein.  I submit this Declaration in support of Kaseya's desires to exercise its right under the provisions of 28 U.S.C. § 1441(a) and (b) to remove this action to this Court.

2.      Annexed hereto as **Exhibit A** is true and accurate copy of the Complaint filed by Plaintiff, IT Network Solutions, LLC ("Plaintiff") in the Superior Court of the New Jersey, County of Middlesex, where this matter is currently pending, entitled, IT Network Solutions, LLC v. Kaseya US Sales, LLC, et al., bearing docket number MID-L-2080-14.

3.     Annexed hereto as **Exhibit B** is true and accurate copy of Kaseya's formation documents.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: */s/ Steven A. Kroll*
Steven A. Kroll, Esq.

Dated: May 30, 2014

# EXHIBIT A

Our File No.: 58904
Darren C. Kayal, Esq. - 026601999
RUDOLPH & KAYAL
Counselors at Law, P.A.
Atlantic Corporate Center
2317 Highway 34, Suite 2C
Manasquan, NJ 08736
TEL # (732) 449-0190 • FAX # (732) 974-9252
Attorneys for Plaintiff, IT Network Solutions, LLC

| | |
|---|---|
| IT NETWORK SOLUTIONS, LLC | : SUPERIOR COURT OF NEW JERSEY |
| | : MIDDLESEX COUNTY: LAW DIVISION |
| Plaintiff, | : |
| | : |
| v. | : DOCKET NO.: MID-L-2080-14 |
| KASEYA US SALES, LLC, John Does 1-5, | : |
| (fictitious), ABC CORPS. 1-5 (fictitious) | : *CIVIL ACTION* |
| | : *SUMMONS* |
| Defendants. | : |

From the State of New Jersey to the Defendant named above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/pro se/10153_deptyclerklawref.pdf.  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

Dated:          April 28, 2014

                                                    *Michelle M. Smith*
                                                    MICHELLE M. SMITH
                                                    Clerk of the Superior Court

*Name and address of Defendant to be served:*     ***KASEYA US SALES, LLC***
                                                  ***c/o Corporation Service Company***
                                                  ***830 Bear Tavern Road***
                                                  ***West Trenton, NJ 08628***

Revised 09/04/2012

04/28/2014 MON 14:49   FAX 732 974 9252 Rudolph & Kayal                                    ☑003/012

Our File No.: 58904
Darren Kayal, Esq. – Attorney ID 026601999
RUDOLPH & KAYAL
Counselors at Law, P.A.
Atlantic Corporate Center
2317 Highway 34, Suite 2-C
Manasquan, NJ 08736
TEL # (732) 449-0190  • FAX # (732) 974-9252
Attorneys for plaintiff IT Network Solutions, LLC

CIVIL RECORDS
N.J. SUPERIOR COURT
MIDDLESEX VICINAGE

2014 APR -7  A 10: 0

FILED & RECEIVED #

| | | |
|---|---|---|
| IT NETWORK SOLUTIONS, LLC, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION |
| Plaintiff | : | MIDDLESEX COUNTY |
| v. | : | |
| | : | DOCKET NO: L-2080-14 |
| KASEYA US SALES, LLC., John | : | |
| Does 1-5, (fictitious), ABC CORPS. | : | CIVIL ACTION |
| 1-5 (fictitious), | : | |
| | : | COMPLAINT, JURY DEMAND |
| Defendants | : | DESIGNATION OF TRIAL COUNSEL |

Plaintiff, IT Network Solutions, LLC, by way of Complaint against the
Defendants, says as follows:

### FIRST COUNT
(Facts Commons to all Causes of Action)

1.    Defendant, Kaseya U.S. Sales, LLC (Kaseya), is a Delaware corporation

engaged in the business of computer software sales and support.

2.    Defendant  Kaseya has a primary place of business at 2077 Gateway Place,

Suite 550, San Jose, CA.

3.    Defendant Kaseya sells and supports its software products to customers in

New Jersey and has a registered agent in New Jersey.

4.     Defendants John Does 1-5 (fictitious) are individuals, entities, servants, and/or agents responsible for taking the plaintiff's funds without legal or contractual authority to do so.

5.     Defendants ABC Corps 1-5 (fictitious) are entities, servant, and/or agents responsible for taking the plaintiff's funds without legal or contractual authority to do so.

6.     Plaintiff IT Network Solutions, LLC is a limited liability company engaged in the business of selling, designing, installing, and maintaining computer networks and data solutions.

7.     Plaintiff IT Network Solutions, LLC has a primary place of business located at 86 Haypress Road in Cranbury, New Jersey.

8.     At all times relevant hereto, plaintiff entered into a contract with defendants for the purchase of 2,500 licenses for Kaseya VSA software.

9.     Defendants agreed to the terms of the sale and began deducting payment from plaintiff's credit card.

10.     Defendant began deducting a maintenance fee from the credit card without an express authorization from the plaintiff.

11.     The original price quoted to plaintiff was $112,500 with a $10,000 down payment.

12.     Plaintiff paid $136,984.89 of the contract price, which was in excess of the quoted cost.

13.    When plaintiff stopped additional payments on the account, defendants advised that since they had not paid in full they were only entitled to own $1,000 licenses. The cost for 1,000 licenses was $66,000.

14.    Plaintiff overpaid defendants by $73,984.89.

15.    Defendant Kaseya stated that the overpayment was "forfeited" by plaintiff.

16.    There is no provision in the contract calling for a "forfeit" of payments.

17.    Plaintiff demanded a return of the money that they were improperly overcharged, but no funds were returned.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.


## SECOND COUNT
### (Breach of Contract)

1.    Plaintiffs incorporate by reference the allegations contained in the First Count of the Complaint as if set forth at length herein.

2.    Plaintiff entered into a contract with defendants to provide goods and services.

3.    Defendants breached the contract with plaintiff.

4.    Specifically, defendant Kaseya overcharged the plaintiff for goods and services provided.

3

5.      Defendant Kaseya then "forfeited" the balance of the overpayment by plaintiffs.

6.      Defendant Kaseya had no contractual rights to forfeit these overpayments.

7.      Plaintiffs have been damaged by this breach of contract

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

## THIRD COUNT
### (Fraud)

1.      Plaintiffs incorporate by reference the allegations contained in the First and Second Counts of the Complaint as if set forth at length herein.

2.      As described in detail above, defendants  made misrepresentations of material fact to the Plaintiff.

3.      The representations by defendants:  (i) were material; (ii) were false when made; (iii) were known by defendants to be false, and (iv) were made in an attempt to deceive the plaintiff.

4.      By virtue of the fraudulent conduct of defendants, as hereinabove alleged, including, but not limited to, the fraudulent and deceptive representations made to the plaintiff, the active concealment of their fraudulent conduct, and the lack of disclosure, as aforesaid, Plaintiff has been defrauded and deceived by defendants.

5.      The defendants had no intention of performing in accordance with their representations.

4

6.      As a direct and proximate result of the aforesaid fraud, plaintiff has suffered damages.

7.      Defendants' fraudulent and deceitful acts of misrepresentation, omissions of material facts and the cover-up and concealment of such material facts were willful and wanton, and in reckless disregard for the plaintiff described herein.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, punitive damages, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

## FOURTH COUNT
### (Unjust Enrichment)

1.      Plaintiffs incorporate by reference the allegations contained the First, Second, and Third Counts of the Complaint as if set forth at length herein.

2.      Defendants have enjoyed the use and benefit of the money advanced to them by the plaintiff, but have failed and refused to repay plaintiff the monies overpaid, despite demands and requests by plaintiff.

3.      As a result of the aforesaid, defendants, have been unjustly enriched.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, punitive damages, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

## FIFTH COUNT
### (Conversion)

1.      Plaintiffs incorporate by reference the allegations contained in the First, Second, Third, and Fourth Counts of the Complaint as if set forth at length herein.

5

2.      Defendants wrongfully obtained, and wrongfully continue to exercise dominion and control over the assets of the plaintiff.

3.      As a direct and proximate result, the Defendants are liable for the damages caused thereby.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, punitive damages, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

SIXTH COUNT
(Breach of Duty of Good Faith and Fair Dealing)

1.      Plaintiffs incorporate by reference the allegations contained in the First, Second, Third, Fourth, and Fifth Counts of the Complaint as if set forth at length herein.

2.      Defendants owed to plaintiff an implied duty of Good Faith and Fair Dealing under New Jersey law including, but not limited to, N.J.S.A. 12A:1-203.

3.      Defendants breached this obligation and acted in bad faith by refusing to return moneys that were overpaid to the defendants and by compelling the Plaintiff to institute litigation to recover amounts owed.

4.      As a direct and proximate result of the aforesaid breach of the duty of good faith, plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, punitive damages, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

6

## SEVENTH COUNT
(New Jersey Consumer Fraud Act)

1.    Plaintiffs incorporate by reference the allegations contained in the First, Second, Third, Fourth, Fifth, and Sixth Counts of the Complaint as if set forth at length herein.

2.    Plaintiff is a consumer protected by the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, et seq.

3.    In violation of the New Jersey Consumer Fraud Act used or otherwise employed unconscionable commercial practices, deception, fraud, misrepresentations, and the knowing concealment, suppression and/or omission of material facts with the intent that the plaintiff rely thereon, in connection with the sale of the Kaseya VSA licenses to plaintiff.

4    As a direct and proximate result of defendants' actions, plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against the defendants, jointly and severally, in the amount of $73,984.89, treble damages, together with attorneys' fees, and costs of suit, and any other relief that the court may deem equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:5-1(c), Darren C. Kayal, Esq. is hereby designated as trial counsel for plaintiff.

7

## CERTIFICATION PURSUANT TO RULE 4:5-1

The undersigned, Darren C. Kayal, Esquire, certifies on behalf of plaintiff as follows:

1.     I am an attorney at law of the State of New Jersey with the firm of Rudolph & Kayal, counsel for plaintiff

2.     The matter in controversy in this case is not, to the best of my knowledge, the subject of any other action pending in any court or pending arbitration proceeding, nor is any action or arbitration proceeding contemplated.

3.     I am not aware of any other parties who should be joined in this action at the present time.

4.     I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

RUDOLPH & KAYAL
Counselors at Law, P.A.
Attorneys for Plaintiff, IT Network Solutions,
LLC

Dated: March 25, 2014                    DARREN C. KAYAL, ESQ.

8

**Appendix XII-B1**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for Initial Law Division
Civil Part pleadings' (not motions) under *Rule* 4:5-1
Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed

| | |
|---|---|
| | FOR USE BY CLERK'S OFFICE ONLY |
| | PAYMENT TYPE:  ☐CK ☐CG ☐CA |
| | CHG/CK NO. |
| | AMOUNT: |
| | OVERPAYMENT: |
| | BATCH NUMBER: |

| ATTORNEY / PRO SE NAME<br>Darren C. Kayal, Esq. | TELEPHONE NUMBER<br>(732) 449-0190 | COUNTY OF VENUE<br>Middlesex |
|---|---|---|
| FIRM NAME (if applicable)<br>Rudolph & Kayal | | DOCKET NUMBER (when available)<br>L-2080-14 |
| OFFICE ADDRESS<br>Atlantic Corporate Center<br>2317 Highway 34, Suite 2C<br>Manasquan, NJ 08736 | | DOCUMENT TYPE<br>Complaint<br><br>JURY DEMAND  ☐ YES  ☐ YES |

| NAME OF PARTY (e.g., John Doe, Plaintiff)<br>IT Network Solutions, LLC, Plaintiff | CAPTION<br>IT Network Solutions, LLC v. Kaseya US Sales, LLC, et al. |
|---|---|

| CASE TYPE NUMBER<br>(See reverse side for listing)<br>599 | HURRICANE SANDY<br>RELATED?<br>☐ YES   ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES  ☒ NO |
|---|---|---|
| | | IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53 A -27 AND APPLICABLE CASE LAW<br>REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| RELATED CASES PENDING?<br>☐ YES      ☒ No | | IF YES, LIST DOCKET NUMBERS |
| DO YOU ANTICIPATE ADDING ANY PARTIES<br>(arising out of same transaction or occurrence)?<br>☐ YES      ☒ No | | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)<br>☐ NONE<br>☒ UNKNOWN |

| THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE. |
|---|

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR<br>RECURRENT RELATIONSHIP?<br>☒ YES   ☐ No | IF YES, IS THAT RELATIONSHIP:<br>☐ EMPLOYER/EMPLOYEE     ☐ FRIEND/NEIGHBOR     ☐ OTHER (explain)<br>☐ FAMILIAL              ☒ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ YES  ☒ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR
ACCELERATED DISPOSITION

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?<br>☐ YES    ☒ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | WILL AN INTERPRETER BE NEEDED?<br>☐ YES    ☒ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be
redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

04/28/2014 MON 14:50  FAX 732 974 9252 Rudolph & Kayal                    ☑012/012

**Side 2**



# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151  NAME CHANGE
175  FORFEITURE
302  TENANCY
399  REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502  BOOK ACCOUNT (debt collection matters only)
505  OTHER INSURANCE CLAIM (including declaratory judgment actions)
506  PIP COVERAGE
510  UM or UIM CLAIM (coverage issues only)
511  ACTION ON NEGOTIABLE INSTRUMENT
512  LEMON LAW
801  SUMMARY ACTION
802  OPEN PUBLIC RECORDS ACT (summary action)
999  OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305  CONSTRUCTION
509  EMPLOYMENT (other than CEPA or LAD)
599  CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605  PERSONAL INJURY
610  AUTO NEGLIGENCE – PROPERTY DAMAGE
621  UM or UIM CLAIM (includes bodily injury)
699  TORT – OTHER

**Track III - 450 days' discovery**
005  CIVIL RIGHTS
301  CONDEMNATION
602  ASSAULT AND BATTERY
604  MEDICAL MALPRACTICE
606  PRODUCT LIABILITY
607  PROFESSIONAL MALPRACTICE
608  TOXIC TORT
609  DEFAMATION
616  WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617  INVERSE CONDEMNATION
618  LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156  ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303  MT. LAUREL
508  COMPLEX COMMERCIAL
513  COMPLEX CONSTRUCTION
514  INSURANCE FRAUD
620  FALSE CLAIMS ACT
701  ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**
266  HORMONE REPLACEMENT THERAPY (HRT)      288  PRUDENTIAL TORT LITIGATION
271  ACCUTANE/ISOTRETINOIN                 289  REGLAN
274  RISPERDAL/SEROQUEL/ZYPREXA            290  POMPTON LAKES ENVIRONMENTAL LITIGATION
278  ZOMETA/AREDIA                         291  PELVIC MESH/GYNECARE
279  GADOLINIUM                            292  PELVIC MESH/BARD
281  BRISTOL-MYERS SQUIBB ENVIRONMENTAL    293  DEPUY ASR HIP IMPLANT LITIGATION
282  FOSAMAX                               295  ALLODERM REGENERATIVE TISSUE MATRIX
284  NUVARING                              296  STRYKER REJUVENATE/ABG II MODULAR  HIP STEM COMPONENTS
285  STRYKER TRIDENT HIP IMPLANTS          297  MIRENA CONTRACEPTIVE DEVICE
286  LEVAQUIN                              601  ASBESTOS
287  YAZ/YASMIN/OCELLA                     623  PROPECIA

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category**   ☐ **Putative Class Action**   ☐ **Title 59**

# EXHIBIT B



PAGE   1

*The First State*

   I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF FORMATION OF "KASEYA US SALES, LLC",

FILED IN THIS OFFICE ON THE THIRTEENTH DAY OF MAY, A.D. 2009, AT

5:17 O'CLOCK P.M.


   AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF

THE AFORESAID CERTIFICATE OF FORMATION IS THE THIRTEENTH DAY OF

MAY, A.D. 2009, AT 12:01 O'CLOCK A.M.

4686806   8100

090469893

Jeffrey W Bullock, Secretary of State

AUTHENTICATION: 7302029

DATE: 05-14-09

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 06:13 PM 05/13/2009*
*FILED 05:17 PM 05/13/2009*
*SRV 090469893 - 4686806 FILE*

## CERTIFICATE OF FORMATION
### OF
### KASEYA US SALES, LLC,
### A DELAWARE LIMITED LIABILITY COMPANY

This Certificate of Formation of Kaseya US Sales, LLC, a Delaware limited liability company (the "LLC"), dated as of April 6th, 2009, is being duly executed and filed by Frank Hoppe, as an authorized person, to form a limited liability company pursuant to the Limited Liability Company Act of Delaware (6 *Del. C.* § 18-101, *et seq.*).

FIRST, the name of the LLC formed hereby will be Kaseya US Sales, LLC.

SECOND, the address of its registered office in the State of Delaware will be 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 in the County of New Castle.

THIRD, the name and address of its registered agent for service of process on the LLC in the State of Delaware will be Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 in the County of New Castle.

FOURTH, the formation of Kaseya US Sales, LLC is to be effective at 12:01 a.m. on May 13th, 2009.

IN WITNESS WHEREOF, this Certificate of Formation has been executed by an authorized person as of the date first above written.

_____
Frank Hoppe, Authorized Person

OM-235023-2

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
## KASEYA US SALES, LLC

This Limited Liability Company Agreement of Kaseya US Sales, LLC, a Delaware limited liability company (the "Company"), is made as of May 12th, 2009, among the Company and the Persons whose names and signatures are set forth on the signature pages hereto.

## Recitals

The Company is a limited liability company under the Delaware Limited Liability Company Act, 6 Del.C. §18-101, *et seq.*, as amended from time to time (the "Delaware Act"), and the Members desire to enter into this Limited Liability Company Agreement to agree upon certain matters relating to the ownership of the Company and to the governance and management of the Company.

## Covenants

In consideration of the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINED TERMS

1.   **Definitions**. Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified.

"Additional Members" means persons who are admitted to the Company as Members pursuant to Article XIII, Section 1 hereof, and who are named as Members on Schedule A to this Agreement.

"Affiliate" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" means this Limited Liability Company Agreement, as amended, modified, supplemented or restated from time to time.

"Available Cash" means, with respect to any Fiscal Year, the sum of (i) all cash receipts of the Company during such Fiscal Year (excluding for this purpose Capital Contributions) and (ii) all reductions made by the Managers during such Fiscal Year in reserves established as

hereinafter provided, less the sum of (i) all cash operating expenditures and all cash debt service payments (including payments of principal, interest and penalties, if any), and (ii) all additions to reserves during such Fiscal Year deemed reasonably appropriate by the Managers, including reserves for capital expenditures, working capital and contingent liabilities.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Article IV, Section 4 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company pursuant to Article IV, Section 1 hereof with respect to the membership interests held by such Member. In the case of a Member who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Agreement, "Capital Contribution" has the meaning set forth in Article IV, Section 4(a) hereof.

"Certificate" means the Certificate of Formation and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"Company" means Kaseya US Sales, LLC, the limited liability company formed under and pursuant to the Delaware Act and this Agreement.

"Covered Person" means a Member, a Manager, any Affiliate of a Member or of a Manager, any officers, directors, shareholders, partners, employees, representatives or agents of a Member, a Manager or their respective Affiliates, or any officer, employee or agent of the Company or its Affiliates.

"Delaware Act" means the Delaware Limited Liability Company Act, 6 Del.C. § 18-101, et seq., as amended from time to time.

"Distribution Percentage" means, for each Member, the percentage set forth opposite such Member's name in Schedule A attached hereto and incorporated herein by this reference.

"Fiscal Year" means (i) a calendar year or (ii) any portion of the period described in Clause (i) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article VIII hereof.

"Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(i)      the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Managers;

(ii)      the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managers, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (a) and clause (b) of this sentence shall be made only if the Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the distributee Member and the Managers.

"Liquidating Trustee" has the meaning set forth in Article XV, Section 3 hereof.

"Manager" or "Managers" means the Persons designated by the Members in Article VI, Section 1 hereof to act collectively as the manager of the Company within the meaning of the Delaware Act and shall include all successors appointed pursuant to the provisions of this Agreement.

"Member" means any Person named as a member of the Company on Schedule A hereto and includes any Person admitted as an Additional Member or a Substitute Member pursuant to the provisions of this Agreement, and "Members" means two or more of such Persons when acting in their capacities as members of the Company.  For purposes of the Delaware Act, the Members shall constitute one class or group of members.

"Member Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(2) of the Treasury Regulations.

"Other Business Entity" has the meaning given it in Section 18-209 of the Delaware Act.

"Person" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or

deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(i)      any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)      any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulation Section 1.704-1 (b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)      in the event the Gross Asset Value of any Company asset is adjusted in accordance with paragraph (ii) or paragraph (iii) of the definition of "Gross Asset Value" above, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses; and

(iv)      gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value.

"Substitute Member" means a Person who is admitted to the Company as a Member pursuant to Article XIV, Section 1 hereof, and who is named as a Member on Schedule A to this Agreement.

"Tax Matters Partner" has the meaning set forth in Article XI, Section 1 hereof.

"Transfer" as a verb means to directly or indirectly issue, sell, transfer, assign, pledge, mortgage, create a security interest in, or in any other way encumber or dispose of membership interests in the Company.  As a noun, it means any issuance, sale, transfer, assignment, pledge, mortgage, creation of a security interest in, or any other encumbrance or disposition of membership interests in the Company.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

## ARTICLE II
## FORMATION AND TERM

1.      **Formation**.

a.      The Company was formed as a limited liability company under the Delaware Act on April 6th, 2009, upon the filing of the Certificate of the Company with the Delaware Secretary of State.  The Members agree that the rights, duties and liabilities

of the Members and the Managers shall be as provided in the Delaware Act, except as otherwise provided herein.

          b.      The name and mailing address of each Member shall be listed on Schedule A attached hereto. The Managers shall be required to update Schedule A from time to time as necessary to accurately reflect the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

        **2.**      <u>Name</u>. The name of the Company is Kaseya US Sales, LLC. The business of the Company may be conducted upon compliance with all applicable laws under any other name designated by the Managers.

        **3.**      <u>Term</u>. The term of the Company commenced April 6th, 2009, the date the Certificate was filed. The term of the Company shall continue until dissolved in accordance with the provisions of this Agreement.

        **4.**      <u>Registered Agent and Office</u>. The Company's registered agent and office in Delaware shall be Corporation Services Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19809. At any time, the Managers may designate another registered agent and/or registered office.

        **5.**      <u>Principal Place of Business</u>. The principal place of business of the Company shall be at 500 East Calaveras Boulevard, Suite 305, Milpitas, California 95035. Upon ten days notice to the Members, the Managers may change the location of the Company's principal place of business.

        **6.**      <u>Qualification in Other Jurisdictions</u>. The Managers may cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business. Any of the Managers, as an authorized person within the meaning of the Delaware Act, may execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**ARTICLE III**
**PURPOSE AND POWERS OF THE COMPANY**

        **1.**      <u>Purpose</u>. The Company is formed for the purpose of engaging in any legal business and all activities necessary or incidental thereto.

        **2.**      <u>Powers of the Company</u>.

          a.      The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose set forth in Article III, Section 1, including, but not limited to, the power:

i.      to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Delaware Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

ii.     to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts or limited liability companies;

iii.    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any of the Managers or any Member or any Affiliate of any of them, or any agent of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company;

iv.     to lend money;

v.      to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

vi.     to elect and designate one or more Managers of the Company in accordance with Article VI, Section 1 hereof and to appoint officers, employees and agents of the Company, and define their duties and fix their compensation;

vii.    to indemnify any Person in accordance with the Delaware Act;

viii.   to cease its activities and cancel its Certificate;

ix.     to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any contract, security agreement or lease in respect of any assets of the Company;

x.      to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

xi.     to take actions to protect and preserve the Company's assets, including insuring the business and assets of the Company against risks;

xii.    to hold Company assets in the name of the Company or in the name of one or more nominees;

xiii.   to open one or more bank accounts in the name of the Company or in any other name in which the Company's funds are to be held, make deposits therein, draw funds therefrom and deal in or with the Company's funds;

xiv.    to make distributions of the Company's funds or assets to the Members as provided for by this Agreement;

xv.    to make such income tax elections as may be appropriate or desirable, as contemplated by the Code and the Treasury Regulations; prepare and file tax returns for the Company with federal, state and local authorities; file amendments to such returns; participate in audits of such returns; consent to extensions relating to such returns; execute documents relating to the settlement of tax proceedings involving the Company or its tax returns; participate in administrative and judicial proceedings, including appeals, relating to the Company's tax returns or its tax liabilities; and settle issues relating to the Company's federal and, to the extent required, state and local income tax returns even though the Members rather than the Company shall be subject to tax as so determined;

xvi.    to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

xvii.    to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purposes of the Company.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS,
## CAPITAL ACCOUNTS AND ADVANCES

1.    **Capital Contributions.** Each Member has contributed or will contribute to the Company the amount of money or property set forth opposite the member's name on Schedule A attached hereto.

2.    **Status of Capital Contributions**.

a.    No Member shall have the right to withdraw its Capital Contribution or Capital Account or to receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member, except as otherwise specifically provided in this Agreement or as specifically provided in other agreements between the Company and such Member.

b.    Except as otherwise provided herein and by applicable state law, the Members shall be liable only to make their Capital Contributions pursuant to Article IV, Section 1 hereof, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contributions have been fully paid pursuant to Article IV, Section 1 hereof, to make any additional Capital Contributions to the Company. Except as otherwise provided herein, no Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

3.   **Capital Accounts**.

a.     An individual Capital Account shall be established and maintained for each Member.  The original Capital Account established for any Member who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Agreement shall be in the same amount as, and shall replace, the Capital Account of the assignor of such interest, and, for purposes of this Agreement, such Member shall be deemed to have made the Capital Contributions made by the assignor of such interest (or made by such assignor's predecessor in interest).  To the extent such Member acquires less than the entire interest in the Company of the assignor of the interest so acquired by such Member, the original Capital Account of such Member and its Capital Contributions shall be in proportion to the interest it acquires, and the Capital Account of the assignor who retains a partial interest in the Company, and the amount of its Capital Contributions, shall be reduced in proportion to the interest it retains.

b.     The Capital Account of each Member shall be maintained in accordance with the following provisions:

i.     to such Member's Capital Account there shall be credited such Member's Capital Contributions and Additional Capital Contributions, such Member's distributive share of Profits and the amount of any Company liabilities that are assumed by such Member or that are secured by any Company assets distributed to such Member;

ii.     to such Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company assets distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and the amount of any liabilities of such Member that are assumed by the Company or that are secured by any property contributed by such Member to the Company; and

iii.     in determining the amount of any liability for purposes of this Subsection (iii), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

4.     **Advances**.  Except as otherwise agreed between the Company and any Member, if any Member shall advance any funds to the Company in excess of its Capital Contributions and Additional Capital Contributions, the amount of such advance shall neither increase its Capital Account nor entitle it to any increase in its share of the distributions of the Company.  No such advance shall be made without the approval of the Managers.  The amount of any such advance shall be a debt obligation of the Company to such Member and shall be repaid to it by the Company with interest at a *per annum* rate equal to the lesser of (i) the prime or reference lending rate of the Company's primary bank plus three percent (3%) per annum, and (ii) the maximum rate permitted by applicable law, and upon such other terms and conditions as shall be mutually determined by such Member and the Managers.  Any such advance shall be payable and collectible only out of Company assets, and the other Members shall not be personally obligated to repay any part thereof.  No Person who makes any nonrecourse loan to the Company

shall have or acquire, as a result of making such loan, any direct or indirect interest in the profits, capital or property of the Company, other than as a creditor.

## ARTICLE V
## MEMBERS

      **1.**    **Powers of Members**. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement. The Members shall also have the power by resolution of amendment to this Agreement to authorize the Managers to possess and exercise any right or power not already vested in the Managers pursuant to Article VI, Section 2 or any other provision of this Agreement. The Members shall not have the power to bind the Company.

      **2.**    **Partition**. Each Member waives, until termination of the Company, any and all rights that it may have to maintain an action for partition of the Company's property.

      **3.**    **Resignation of Members**. A Member may not resign or withdraw from the Company as a Member without the approval of Members having not less than a majority of the total Distribution Percentages (except that this restriction shall not prevent any Member from transferring its interest in the Company to the extent permitted in Article XIV).

## ARTICLE VI
## MANAGERS

      **1.**    **Designation of Managers**. The management of the Company's business shall be vested in its Managers designated as provided in this Article VI, Section 1 and referred to as Managers in this Agreement. The Managers may be but need not be Members. The Members hereby agree that there shall initially be one Manager who shall be Kaseya International Shared Services, Sarl. Managers shall serve at the pleasure of the Members and may be removed at any time with or without cause. The number of Managers may be increased or decreased by resolution of the Members and any vacancies created by an increase shall be filled by the Members.

      **2.**    **Action by the Managers**. Fifty percent of the number of Managers shall constitute a quorum for the transaction of business at any meeting of the Managers; provided, however, that if there are two Managers, a quorum shall require both Managers. If a quorum is present when a vote is taken, the affirmative vote of a majority of the Managers present at a meeting of the Managers shall be the act of the Managers. The Managers shall permit any or all Managers to participate in a regular or special meeting of the Managers by, or conduct the meeting through the use of, any means of communication by which all Managers participating in the meeting may simultaneously hear each other during the meeting. A Manager participating in a meeting of the Managers by such means shall be deemed to be present in person at the meeting. Any action required or permitted by this Agreement or the Delaware Act to be taken at a meeting of the Managers may be taken without a meeting if the action is taken by a majority of the Managers. The action shall be evidenced by one or more written consents describing the action taken, signed by the Managers taking the action, and included in the minutes or filed with the Company records reflecting the action taken. A copy of such consent(s) shall be delivered to all

Managers promptly following execution.  A consent signed under this section shall have the effect of a meeting vote and may be described as such in any document.  Prompt notice of any action taken by a consent signed by less than all of the Managers shall be given to any Manager who did not sign such consent.  Each Manager (including any authorized officer of such Manager to the extent the Manager is an entity) and any officer of the Company shall be authorized to execute any document or take any action on behalf of the Company if such document or action has been approved by the Managers or if the Managers have delegated to such Manager or officer the authority to execute documents or take actions of such type.

      **3.**     **Power and Authority of the Managers.**  Subject to the limitations expressly set forth in this Agreement, the business and affairs of the Company shall be managed by the Managers.

      **4.**     **Management Fees and Reimbursement.**

      a.     The Company shall reimburse the Managers for all ordinary and necessary out-of-pocket expenses incurred by the Managers on behalf of the Company.

      b.     Amounts reimbursed pursuant to Subsection (a) shall be treated as expenses of the Company and shall not be deemed to constitute a distributive share of Profits or a distribution to the Managers.

      c.     Except for the reimbursement of expenses described in this Subsection 4, the Managers shall not be entitled to any compensation as Managers unless approved by the Members, although nothing in this Agreement shall prevent a Manager, or an entity that is an Affiliate of a Manager, from receiving compensation from the Company in any other capacity.

      **5.**     **Notice for Managers' Meetings.**  Meetings of the Managers may be called at any time and place by any Manager. Notice of the time and place of each meeting shall be given by the person calling the meeting. The notice may be written or oral and shall be given at least five (5) days in advance of the meeting. Written notice may be given by mail, electronic mail, private carrier or personal delivery, telegraph or teletype, or telephone, wire or wireless equipment which transmits a facsimile of the notice. Oral notice may be communicated in person or by telephone, wire or wireless equipment which does not transmit a facsimile of the notice. Such notice shall be effective at the earlier of (i) when it is received, or (ii) five (5) days after it is deposited in the United States mail, first-class postage prepaid, and correctly addressed. The purpose of the meeting need not be given in the notice. Notice of any meeting may be waived in writing (either before or after such meeting) and will be waived by any Manager by attendance at or participation in the meeting, unless the Manager at the beginning of the meeting, or promptly upon the Manager's arrival, objects and does not thereafter vote for or assent to action taken at the meeting. Regular meetings of the Managers may be held at such place and on such day and hour as shall from time to time be fixed by resolution of the Managers. No notice of regular meetings of the Managers shall be necessary. At any meeting of the Managers, any business may be transacted, and the Managers may exercise all of their powers.

      **6.**     **Resignation of a Manager.**  A Manager may resign as Manager at any time upon notice to the Members and the other Managers.

OM-227968-1

7.     **Officers.** The Company shall have such officers as shall be determined by the Managers, and the authority and duties of each officer shall be determined by the Managers. All officers shall be appointed by the Managers and may be removed at any time by the Managers with or without cause.

## ARTICLE VII
## MEETINGS; AMENDMENTS; MERGER OR CONSOLIDATION

1.     **Meetings of the Members.**

a.     Meetings of the Members may be called by the Managers and shall state the location of the meeting and the nature of the business to be transacted. Notice of any such meeting shall be given to all Members not less than three business days nor more than thirty business days prior to the date of such meeting. Members may vote in person or by proxy at such meeting. Members may participate in such a meeting by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this sentence shall constitute presence in person at the meeting. Unless otherwise specifically provided herein or in the Delaware Act, any action which may be taken at a meeting of Members may be taken with the approval of Members having not less than a majority of the total Distribution Percentages. Whenever a vote, consent or approval of Members is permitted or required under this Agreement, such vote, consent or approval may be given at a meeting of Members or may be given in accordance with the procedure prescribed in Subsection (e).

b.     For the purpose of determining the Members entitled to vote on, or to vote at, any meeting of the Members or any adjournment thereof, the Managers may fix, in advance, a date as the record date for any such determination. Such date shall not be more than thirty business days nor less than ten business days before any such meeting.

c.     Each Member may authorize any Person to act for it by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or its attorney-in-fact. No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the discretion of the Member executing it unless otherwise provided in the proxy.

d.     Each meeting of Members shall be conducted by the Managers or such other Person that the Managers designate.

e.     Any action which may be taken at a meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by Members having not less than a majority of the total Distribution Percentages and shall be delivered to the Company by delivery to its registered office, its principal place of business or to an officer or agent of the Company having custody of the books in which proceedings of Members are

recorded.   Delivery made to the Company's registered office shall be by hand or by certified or registered mail, return receipt requested.

**2.**     **Amendments.** Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if it receives the approval of the Managers and a favorable vote of Members holding at least a majority of the total Distribution Percentages; provided, however, that no such amendment shall (i) change the purpose of the Company from that set forth in Article III, Section 1, (ii) alter the Capital Account of any Member, (iii) change the allocation provisions of Article VIII hereof, (iv) alter the respective Distribution Percentages of the Members, (v) increase the liabilities of any Member beyond those provided for in Article XII, Section 1, (vi) cause the Company to cease to qualify as a limited liability company under the Delaware Act, or (vii) amend this Article VII, Section 2 to delete or alter any of clauses (i) through (vii), in each case without the consent of any Member or any class of Members adversely affected thereby.

**3.**     **Merger or Consolidation.** The Company may merge with, or consolidate into, one or more other Delaware limited liability companies or Other Business Entities only with the approval of the Managers and a favorable vote of Members holding at least a majority of the total Distribution Percentages.

## ARTICLE VIII
## ALLOCATIONS

**1.**     **Profits and Losses.** Subject to the allocation rules of Article VIII, Section 2 hereof, Profits and Losses for any Fiscal Year shall be allocated among the Members as follows:

a.     Allocation of Profits. Profits for any Fiscal Year shall be allocated among the Members as follows:

i.     to the Members, in an amount equal to the Loss allocated to such Members pursuant to Section 1.b.(iii) (and not previously offset by Profit allocated pursuant to this Section 1a.(i)), among the Members in the proportion that each member's unoffset Loss under Section 1.b.(iii) bears to the total aggregate unoffset Loss of all Members under Section 1.b.(iii);

ii.     to the Member allocated Loss pursuant to Section 1.b.(ii), in an amount equal to the Loss allocated to such Member pursuant to Section 1.b.(ii) (and not previously offset by Profit allocated pursuant to this section 1.a.(ii));

iii.     to the Members, in an amount equal to the Loss allocated to such Members pursuant to Section 1.b.(i) (and not previously offset by Profit allocated pursuant to this Section 1.a.(iii)), among the Members in the proportion that each Member's unoffset Loss under Section 1.b.(i) bears to the total aggregate unoffset Loss of all Members under Section 1.b.(i);

iv.     to the Members, in accordance with their Distribution Percentages.

    b.      Allocation of Losses.  Losses for any Fiscal Year shall be allocated among the Members as follows:

        i.      to the Members, in accordance with their Distribution Percentages, until Loss has been allocated pursuant to this Section 1.a.(i) to the Member with the smallest positive Capital Account balance equals the positive Capital Account balance of such Member;

        ii.      to the Member with a positive Capital Account balance, in an amount equal to such positive Capital Account balance;

        iii.      to the Members, in accordance with their Distribution Percentages.

**2.**    **Allocation Rules**.

    a.      In the event Members are admitted to the Company pursuant to this Agreement on different dates, the Profits or Losses allocated to the Members for each Fiscal Year during which Members are so admitted shall be allocated among the Members in proportion to the Distribution Percentage each holds from time to time during such Fiscal Year in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers.

    b.      For purposes of determining the Profits, Losses or any other items allocable to any period, Profits, Losses and any such other items shall be determined on a daily, monthly or other basis, as determined by the Managers using any method that is permissible under Section 706 of the Code and the Treasury Regulations thereunder.

    c.      Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits and Losses for the Fiscal Year in question.

    d.      Profits and Losses and items thereof shall be allocated as though this Agreement contained a qualified income offset provision and minimum gain chargeback provisions that comply with the requirements of Section 1.704-1(b)(2)(ii)(d), 1.704-2(f) and 1.704-2(i)(4) of the Treasury Regulations, respectively.

    e.      Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1) and (2).

    f.      Notwithstanding the other provisions of this Article VIII, unless otherwise agreed to by all of the Members, no Member shall be allocated Loss in any taxable year that would cause or increase an Adjusted Capital Account Deficit.  Adjusted Capital Account Deficit means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (i) increased for any amounts such member is unconditionally

obligated to restore and the amount of such Member's share of partner minimum gain and partnership minimum gain (as such terms are utilized in Regulation § 1.704-2) after taking into account any changes during such year, and (ii) reduced by the items described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

3.   **Tax Allocations.**

a.   In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with Article I, Section 1 hereof).

b.   In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (ii) of the definition of "Gross Asset Value" contained in Article I, Section 1 hereof, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder.

c.   Any elections or other decisions relating to allocations under this Section 3, including the selection of any allocation method permitted under proposed Treasury Regulation Section 1.704-1(c), shall be made by the Managers in any manner that reasonably reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 3 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, or other items or distributions pursuant to any provision of this Agreement.

## ARTICLE IX
## DISTRIBUTIONS

1.   **Distributions.** Except as otherwise provided in Article IX, Section 4 and Article XV hereof, all distributions shall be made at such times and in such amounts as shall be determined by the Managers. Except as otherwise provided in Article XV or Article IX, Section 4 hereof, all distributions shall be paid to the Members in proportion to the Distribution Percentage held by each of them.

2.   **Withheld Taxes.** All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article IX for all purposes of this Agreement. The Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law and shall allocate such amounts to those Members with respect to which such amounts were withheld. If the Managers conclude that the Company is required to withhold any amount as described in the preceding sentence, it shall

provide prompt written notice to the Members of the reasons it believes that the Company is required to so withhold and an explanation of the calculation of the amounts withheld or to be withheld.

3. **Limitations on Distributions.** Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate Section 18-607 of the Delaware Act or other applicable law.

4. **Tax Distributions.**

a. Notwithstanding anything to the contrary in this Agreement, the Managers shall cause the Company to make distributions out of Available Cash to each Member within 75 days after the end of any Fiscal Year of the Company, in an amount equal to (i) the excess of (A) the total amount of taxable income allocated to such Member for such Fiscal Year, over (B) the amount, if any, by which the sum of all items of deduction and loss allocated to such Member for all prior Fiscal Years exceeds the sum of all items of taxable income allocated to such Member for all prior Fiscal Years, multiplied by (ii) 40% (the "Tax Distributions"), for the purpose of enabling such Member to pay estimated or annual federal, state, or local income taxes with respect to his, her or its allocable shares of taxable income of the Company; provided, however, that subsequent distributions to such Member made during such Fiscal Year and subsequent Fiscal Years shall be adjusted as necessary to ensure that, over the entire term of the Company the aggregate cash distributed to a Member shall be equal to the amount to which such Member would have been entitled had there been no Tax Distributions. In the event that in any Fiscal Year Available Cash is insufficient to permit the payment in full of the Tax Distributions computed as set forth above, then (i) the Tax Distributions for such Fiscal Year shall be made pro rata to the Members based on the total Tax Distributions to which each Member would be entitled if Available Cash were sufficient to permit payment in full of the Tax Distributions and (ii) in any subsequent Fiscal Year in which Available Cash exceeds required Tax Distributions, the Tax Distributions payable under this Subsection (a) shall be increased (but not in excess of Available Cash) until such deficiency has been recouped.

b. The Managers may cause the Company to make periodic distributions to the Members during each Fiscal Year based on their reasonable estimate of the amount that will be required to be distributed pursuant to Subsection (a) for such Fiscal Year in order to provide funds to the Members for the payment of estimated taxes by them. In the event any such periodic distributions are made for any Fiscal Year, the amount of the distributions made after the end of the Fiscal Year shall be appropriately adjusted so that the total amount distributed to each Member (taking into account periodic distributions made pursuant to this Subsection (b)) is equal to the amount such Member would have been entitled to receive pursuant to Subsection (a) had no such periodic distributions been made.

## ARTICLE X
## BOOKS AND RECORDS

**1.**     <u>Books, Records and Financial Statements</u>. At all times during the continuance of the Company, the Company shall maintain, at its principal place of business, separate books of account for the Company that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Company's business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with a copy of this Agreement and of the Certificate, shall at all times be maintained at the principal place of business of the Company and shall be open to inspection and examination at reasonable times by each Member and its duly authorized representative for any purpose reasonably related to such Member's interest in the Company.

**2.**     <u>Confidentiality</u>. Each Member and each Manager hereby covenant and agree that so long as such Member holds a membership interest in the Company, or so long as such Manager serves as a Manager, and for a period of three years thereafter, such Member or Manager will hold in confidence all financial and other information concerning the Company and will not, without the prior consent of the Company, disclose any of such information to any person. The preceding sentence shall not apply to information which (i) is disclosed in a printed publication available to the public, or is otherwise in the public domain through no act of such Member or Manager or the employees or agents of such Member or Manager or other person or entity which has received such information from or through such Member or Manager or (ii) is required to be disclosed by proper order of a court of applicable jurisdiction after adequate notice to the Company sufficient to permit the Company to seek a protective order therefor. Such Member or Manager agrees to approve and support the imposition of such protective order.

## ARTICLE XI
## TAX MATTERS

**1.**     <u>Tax Matters Partner</u>.

    a.     The Managers are hereby authorized to designate a Member of the Company to serve as the tax matters Member of the Company for purposes of Section 6231(a)(7) of the Code (the "Tax Matters Partner"). The Tax Matters Partner shall have the power to manage and control, on behalf of the Company, any administrative proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. The Tax Matters Partner may be one of the Managers if such Manager is a Member. The initial Tax Matters Partner shall be Coleman White acting in his capacity as CFO of Kaseya Holdings, Sarl who shall hold such position until replaced by the Managers as set forth herein.

    b.     The Tax Matters Partner shall, within ten days of the receipt of any notice from the Internal Revenue Service in any administrative proceeding at the Company level

relating to the determination of any Company item of income, gain, loss, deduction or credit, mail a copy of such notice to each Member.

     c.     The Managers may at any time hereafter designate a new Tax Matters Partner; *provided, however,* that only a Member may be designated as the Tax Matters Partner of the Company.

     **2.**     **Right to Make Tax Elections.**  The Managers may, in their discretion, make or revoke, on behalf of the Company, any tax election under the Code or the Treasury Regulations, or under state, local or foreign law, including the election under Section 754 of the Code.

## ARTICLE XII
## LIABILITY, EXCULPATION AND INDEMNIFICATION

     **1.**     **Liability.**

     a.     Except as otherwise provided by the Delaware Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Covered Person shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Covered Person.

     b.     Except as otherwise expressly required by law, a Member, in its capacity as such, shall have no liability in excess of (i) the amount of its Capital Contributions, (ii) its share of any assets and undistributed profits of the Company, (iii) its obligation to make other payments expressly provided for in this Agreement, and (iv) the amount of any distributions wrongfully distributed to it.

     **2.**     **Exculpation.**

     a.     No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

     b.     A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, Profits or Losses or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

3. **Duties of Covered Persons.**

    a.    In accordance with Section 18-1101(c)(2) of the Delaware Act, the duties and liabilities of the Managers and the Members, in their capacities as such, shall be limited to those set forth in this Agreement.

    b.    To the extent that a Covered Person has duties and liabilities relating to the Company or its Members or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or its Members or to any other Covered Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

    c.    Whenever in this Agreement a Covered Person is permitted or required to make a decision (i) in its "discretion" or under a grant of similar authority or latitude, the Covered Person shall be entitled to consider any such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or other applicable law.

4. **Indemnification.** To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions; *provided, however,* that any indemnity under this Section 4 shall be provided out of and to the extent of Company assets only, and no Covered Person shall have any personal liability on account thereof.

5. **Expenses.** To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person in defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Article XII, Section 4 hereof.

## ARTICLE XIII
## ADDITIONAL MEMBERS

**1.**     **Additional Members.**  Additional Members may be admitted upon the written consent of all the Members at the time that such person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto.

**2.**     **Allocations.** Additional Members shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other items; provided that, subject to the restrictions of Section 706(d) of the Code, Additional Members shall be entitled to their respective share of the Company's income, gains, losses, deductions, credits and other items arising under contracts entered into or from securities acquired before the date on which the party became an Additional Member to the extent that such income, gains, losses, deductions, credits and other items arise after such date.  To the extent consistent with Section 706(d) of the Code and Treasury Regulations promulgated thereunder, the Company's books may be closed at the time the party became an Additional Member (as though the Company's tax year had ended) or the Company may credit to the Additional Member pro rata allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the date on which the party became an Additional Member, as determined by the Managers in their discretion.

## ARTICLE XIV
## ASSIGNABILITY AND SUBSTITUTE MEMBERS

**1.**     **Assignability of Membership Interests.** No Member may assign the whole or any part of its interests in the Company without the consent of the Managers and the members holding at least a majority of the Distribution Percentages.  No assignment, or any part thereof, that is in violation of this Article XIV shall be valid or effective, and neither the Company nor the Members shall recognize the same for the purpose of making distributions pursuant to Article IX, Section 1 hereof with respect to such Company interest or part thereof.  Neither the Company nor the nonassigning Members shall incur any liability as a result of refusing to make any such distributions to the assignee of any such invalid assignment.  Notwithstanding anything in this Article XIV to the contrary, no Transfer of membership interests in the Company shall be made unless such Transfer complies with all applicable federal and state securities laws.

**2.**     **Permitted Transfers.** The following Transfers shall not constitute a violation of the provisions of Article XIV, Section 1:

        a.      A Transfer from the name of a deceased Member to the name of either the personal representative of the deceased Member's estate or the nominee of such personal representative and a subsequent Transfer to the heirs of such deceased Member.

        b.      A Transfer by a Member (the "Donor") (i) directly to or in trust for the primary benefit of the Donor, the spouse of the Donor, or the issue of the Donor or his spouse or (ii) by a Donor that is an entity to the shareholders or members of such entity (a person receiving membership interests pursuant to this Article XIV, Section 2(b). is hereinafter referred to as a "Donee"), subject to the following conditions:

       i.     The Donor shall give written notice of the Transfer to the Company and each other Member within five (5) days after the date of the Transfer, and such notice shall include the following information: name of Donor, name and address of Donee, Donee's relationship to Donor, amount of membership interests transferred, and date of Transfer.

       ii.    The Donee receiving the transferred membership interests automatically shall become and thereafter shall be subject to all of the terms of this Agreement, but no membership interests shall be registered in the name of the Donee on the books of the Company and the Donee shall not become a Substitute Member until the Donee shall have executed and delivered to the Company an instrument satisfactory to the Company by which the Donee accepts the terms of this Agreement and agrees to be bound thereby. Upon the Company's receipt of such instrument from the Donee, the Donee shall be admitted to the Company as a Substitute Member and Schedule A shall be revised accordingly.

    **3.**    **Indemnification.** In the case of an assignment or attempted assignment of an interest in the Company that is not permitted by this Article XIV, the parties engaging or attempting to engage in such assignment shall be liable to indemnify and hold harmless the Company and the other Members from all costs, liabilities and damages that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such assignment or attempted assignment and efforts to enforce the indemnity granted hereby.

    **4.**    **Effective Date of Assignment.** Any valid assignment of a Member's interest in the Company, or part thereof, pursuant to the provisions of this Article XIV shall be effective as of the close of business on the last day of the calendar month in which the assignee is qualified to become an Additional Member. The Company shall, from the effective date of such assignment, thereafter pay all further distributions on account of the Company interest (or part thereof) so assigned, to the assignee of such interest, or part thereof. As between any Member and its assignee, Profits and Losses for the Fiscal Year of the Company in which such assignment occurs shall be apportioned for federal income tax purposes in accordance with any convention permitted under Section 706(d) of the Code and selected by the Managers in their discretion.

## ARTICLE XV
## DISSOLUTION, LIQUIDATION AND TERMINATION

    **1.**    **No Dissolution.** The Company shall not be dissolved by the admission of Additional Members or Substitute Members in accordance with the terms of this Agreement.

    **2.**    **Events Causing Dissolution.** The Company shall be dissolved and its affairs shall be wound up only upon the occurrence of any of the following events:

       a.    the approval of the Managers and the vote of Members to dissolve the Company; or

        b.       the entry of a decree of judicial dissolution under Section 18-802 of the Delaware Act.

3.      **Notice of Dissolution**. Upon the dissolution of the Company, the Person or Persons approved by the Members to carry out the winding up of the Company (the "Liquidating Trustee") shall promptly notify the Members of such dissolution.

4.      **Liquidation**. Upon dissolution of the Company, the Liquidating Trustee shall immediately commence to wind up the Company's affairs; *provided, however,* that a reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the satisfaction of liabilities to creditors so as to enable the Members to minimize the normal losses attendant upon a liquidation.  The Members shall continue to share Profits and Losses during liquidation in the same proportions, as specified in Article VIII hereof, as before liquidation.  Each Member shall be furnished with a statement prepared by the Company's certified public accountants that shall set forth the assets and liabilities of the Company as of the date of dissolution.  The proceeds of liquidation shall be distributed, as realized, in the following order and priority:

        a.       to creditors of the Company, including the Managers or Members who are creditors, to the extent otherwise permitted by law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for distributions to Members;

        b.       pro rata to all Members in an amount equal to their Capital Account; and then

        c.       pro rata to all Members.

5.      **Termination**. The Company shall terminate when all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company, shall have been distributed to the Members in the manner provided for in this Article XV, and the Certificate shall have been canceled in the manner required by the Delaware Act.

6.      **Claims of the Members**. The Members shall look solely to the Company's assets for the return of their Capital Contributions, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to return such Capital Contributions, the Members shall have no recourse against the Company or any other Member or the Managers.

## ARTICLE XVI
## MISCELLANEOUS

1.      **Notices**. All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be sent by Federal Express or other reliable overnight courier, sent by fax, hand-delivered, or mailed by registered or certified mail, return receipt requested, as follows:

        a.     if given to the Company, in care of the Managers at the address of the Company's principal place of business;

        b.     if given to the Managers, at their mailing address set forth on Schedule A attached hereto; or

        c.     if given to any Member at the address set forth opposite its name on Schedule A attached hereto, or at such other address as such Member may hereafter designate by written notice to the Company.

Each such notice shall be deemed to have been given upon the earlier of the receipt of such notice by the intended recipient thereof, two days after it is sent by Federal Express or other reliable overnight courier or sent by fax, or five days after it is mailed by registered or certified mail, return receipt requested.

    **2.**    <u>**Failure to Pursue Remedies**</u>. The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

    **3.**    <u>**Cumulative Remedies**</u>.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

    **4.**    <u>**Binding Effect**</u>.  This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, legal representatives and assigns.

    **5.**    <u>**Captions**</u>.  The captions herein are inserted for convenience of reference only and shall not affect the construction of this Agreement.

    **6.**    <u>**Pronouns and Plurals**</u>.  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and *vice versa*.

    **7.**    <u>**Severability**</u>. The invalidity or unenforceability of any particular provision of this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

    **8.**    <u>**Counterparts**</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

    **9.**    <u>**Integration**</u>. This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

OM-227968-1

**10.**    **Governing Law.**  This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of Delaware, and all rights and remedies shall be governed by such laws without regard to principles of conflict of laws

**11.**    **Arbitration.**    Any controversy or claim arising out of or relating to this Agreement, or the claimed breach or interpretation thereof, including, but not limited to, any impasse reached by the parties after negotiating in good faith, shall be resolved by binding arbitration in accordance with the then existing Rules for Commercial Arbitration of the American Arbitration Association (the "Rules").  To the extent permitted by law, compliance with this Section 11 is a condition precedent to the commencement by any party of a judicial proceeding arising out of any dispute relating directly or indirectly to this Agreement in accordance with the Rules.  Any judgment or award rendered by the arbitrator shall be final and binding and judgment may be entered by any court having jurisdiction thereof.   The parties hereto agree to comply with any award made in any such arbitration proceedings that has become final in accordance with the Rules and agree to the entry of judgment in any jurisdiction upon any award rendered in such proceedings becoming final under the Rules.  The locale of any arbitration shall be Omaha, Nebraska.

**12.**    **Access to Information.**    The Members shall have access to information as provided in Section 18-305 of the Delaware Act.

**13.**    **Waiver of Court Review.**  Any Manager hereby waives the right to court review under Section 18-110 of the Delaware Act in the event of removal by the designating Member(s).

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

KASEYA US SALES, LLC.

By: Kaseya International Shared Services, Sarl
Title: Manager

By: _____

Name: _FRANK I. Hoppe_____

Title: _EVP & GC_____

MEMBERS:

KASEYA SERVICES, SA

By: _____

Name: _Mark J. Sutherland_____

Title: _Board Member_____

OM-227968-1

24

**SCHEDULE A**

MEMBERS:

| Name & Address | Capital Contribution | Distribution Percentage |
|---|---|---|
| Kaseya Enterprises Global, SA, f/k/a Kaseya Services, SA Avenue de Gratta-Paille 2, CP 476, CH-10018 Lausanne 30, Switzerland | $100 | 100% |

June 3, 2009